

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00471-CV

_____

IN THE INTEREST OF I.A. AND A.A., CHILDREN

---

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 23-9226-442

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

In this ultra-accelerated appeal, the father of I.A. and A.A. appeals the trial court's judgment terminating his parent–child relationship with the children. Father[1] raises two points on appeal, contending that he did not receive effective assistance of counsel and that the evidence is insufficient to prove all of the conduct and best-interest findings. Because we hold that Father has not shown from the silent record that his counsel was ineffective, and because we hold that the evidence is both legally and factually sufficient to prove the trial court's endangerment and best-interest findings, we affirm.

## Background

In October 2023, the Department removed I.A. and A.A.—then four years old and two years old, respectively—from their mother's possession based on allegations of potential drug use by Mother and because of the condition of the home in which they were living;[2] at the time, Father was incarcerated after being arrested for assaulting Mother. A little over a week after the Department filed the removal petition, the trial court appointed counsel for both Father and Mother. Mother both confirmed and denied Father's paternity to the Department; thus, Father agreed to undergo paternity testing. Although the Department prepared a service plan for

---

[1]To protect the children's identities, we use generic titles to refer to their family members. *See* Tex. R. App. P. 9.8(b).

[2]After the removal, Mother tested positive for methamphetamine, cocaine, and alcohol, and she also admitted that she had used "THC."

2

Father, he did not want to sign it or participate in services unless he was confirmed to be the children's father. Father's paternity was confirmed in February 2024.

Meanwhile, in December 2023, the trial court had ordered the case to be mediated on August 2, 2024, at 9:00 a.m. At an April 2024 pretrial hearing, the attorneys discussed the scheduled mediation with the trial court. They confirmed to the trial judge that Father was not incarcerated at the Denton County Jail but at an out-of-town facility. The trial judge noted,

> THE COURT: So just contact them, see if it is -- sometimes they need it.[3] Sometimes they just say, "I'm not gonna do it."
>
> MR. SIMPSON: Okay.
>
> THE COURT: And sometimes they work with us, so just -- you're gonna have to make that effort, and sometimes they say they need a Court order. If they need it, then I'll give it to you.
>
> MR. SIMPSON: All right. Thank you, Your Honor.
>
> THE COURT: Okay. If you want a bench warrant, I can do that too. That's not worked sometimes too. They just say, "Yeah, whatever."

On August 1, 2024, the day before the scheduled mediation, the trial court held a permanency hearing. The children were in a kinship placement with their maternal grandmother, and Mother was incarcerated in the Denton County Jail. The Department's attorney indicated that it had reached an agreement with Mother's attorney and the children's ad litem "that Mother and relative are comfortable with." But she then stated, "I don't believe that we are able to mediate with Father, given

---

[3]It is unclear from the record what the trial judge meant by "it."

3

that he is located at the Hightower Unit, which is in Amarillo." Therefore, she did not think that the mediation date was going to be necessary.

The trial judge then questioned Father's counsel:

THE COURT: Did we not attempt to get him to appear via Zoom for the mediation?

. . . .

MR. SIMPSON: I did not. I did not -- I have never done that before, so I was unaware that could be done, honestly, Your Honor.

THE COURT: I mean, you don't know if you don't ask.

MR. SIMPSON: You're right.

THE COURT: Because, well, I guess, a little frustrated because we have a mediation date that are valuable dates that it appears we're not gonna use; and then, two, I don't know how we will resolve something if we don't try, and I don't know if Amarillo will or not, but I -- I can sign an order for him to appear via Zoom for the mediation, at least to try to give him the opportunity to participate somehow in this.

If we go to final trial, I absolutely need to have an order for him to appear via Zoom so he can participate, and there needs to be conversation, and I'm assuming Amarillo would have Zoom. If not, I mean, we can do it by phone. I hate to do that by phone, but we can do it by -- by Zoom.

MR. SIMPSON: In my understanding, the previous caseworker told me that we -- he had planned -- he wanted to relinquish and had been in the process of getting Hightower to set up a time to talk to the -- talk to the client at the Hightower Unit, so I'm in the process of trying to get that set up.

THE COURT: Okay. Well, if you need any orders from me, I'm more than happy to do that. I mean, he needs to be able to be communicated with and --

4

MR. SIMPSON: Right.

THE COURT: -- be a part of this process . . . .

The trial court ended the hearing by admonishing Mother of the consequences of going to trial without an agreement with the Department.

Mother signed an affidavit relinquishing her parental rights that same day. The trial court then signed an interlocutory order terminating Mother's parent–child relationship with I.A. and A.A.

At a pretrial conference on September 20, 2024, nothing was mentioned about any attempt to mediate with Father. When discussing how many witnesses were expected to testify at trial, Father's counsel stated, "I might have one if I decide to put my client on, but . . ." The trial judge interjected to ask whether Father would be present, and the Department noted that a bench warrant for Father had been issued. The judge asked Father's counsel, "But we anticipate them moving him, correct?" And Father's counsel answered, "As far as I know."

The September 30, 2024 bench trial was short. After hearing testimony from three witnesses, none of whom were Father, the trial court found that Father had endangered the children; that Father had knowingly engaged in criminal conduct that resulted in his conviction, "confinement or imprisonment," and inability to care for I.A. and A.A. for not less than two years from the date of the petition's filing; and that terminating the parent–child relationship would be in the children's best interest. *See*

5

Tex. Fam. Code Ann. § 161.001(b)(1)(D)–(E), (Q), (b)(2).  Father timely filed a notice of appeal, but he did not file a motion for new trial.[4]

**Ineffective Assistance**

In his first issue, Father contends that his trial counsel was ineffective, primarily for failing to secure Father's presence at mediation.

**A.  Standard of Review**

Parents have the right to effective assistance of counsel in termination cases. *In re J.O.A.*, 283 S.W.3d 336, 341, 343 (Tex. 2009); *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).  We review ineffective-assistance claims for both appointed and retained counsel under the *Strickland* standard applicable to criminal prosecutions.  *In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021).  Under that standard, an appellant must prove by an evidentiary preponderance that his counsel's representation was deficient and that the deficiency prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the

---

[4]After filing the notice of appeal, Father's counsel filed a motion to withdraw, in which he stated, "Trial counsel has corresponded with [Father] about the benefits of having different counsel handle an [a]ppeal, and [Father] approved of the substitution."  The trial court allowed trial counsel to withdraw and appointed new counsel on appeal.  Because Father has not challenged this withdrawal, we presume that he has conceded it was based on good cause.  *See* Tex. Fam. Code Ann. § 107.016(2)(C).

circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *In re I.Z.*, No. 02-24-00354-CV, 2024 WL 4509771, at *4 (Tex. App.—Fort Worth Oct. 17, 2024, no pet.) (mem. op.). Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08; *I.Z.*, 2024 WL 4509771, at *4.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064; *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006). In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *M.S.*, 115 S.W.3d at 549–50.

An ineffective-assistance-of-counsel allegation in a termination proceeding must be firmly founded in the record, and the record must affirmatively show the alleged ineffectiveness and the resulting harm. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *9 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.). When the record is silent regarding counsel's reasons for doing or not doing something, we may not speculate to determine that trial counsel was ineffective. *Id.* Only when the conduct was so outrageous that no competent attorney would have engaged in it can we conclude that the challenged conduct constituted ineffective assistance. *Id.* at *8.

7

## B. Analysis

### 1. Pretrial Mediation

Father argues that he "was not allowed to participate in the mediation due to counsel's failures to communicate with him, secure his appearance either in person or remotely, or request the trial court's offer for a court order to be entered for Appellant Father's presence *via* zoom from TDCJ in the mediation process." He contends that he was harmed because,

> [a]s a result of counsel's failure to communicate with [him] about his right to be present at the court-ordered mediation and the possible consequences of failing to reach an agreement in mediation, . . . counsel wholly deprived [him] of his right to preserve any contact or relationship with his children as part of the mediation process.

The record shows that Mother and the Department had already come to an agreement before the scheduled August 2 mediation date and that Mother signed the affidavit of relinquishment on August 1, the day of the pretrial hearing.[5] The trial

---

[5]Father's brief contains more than one inaccurate statement purportedly based on the record. For instance, the brief asserts that Mother signed the affidavit of relinquishment "at mediation," in support of the argument that a mediation took place that Father was prevented from attending. The record, however, belies this assertion; Mother signed the affidavit after the August 1 pretrial hearing—as the Department had represented to the trial court that it anticipated Mother would do. We remind Father's counsel that she owes a duty of candor toward the court in everything she files; this duty includes accurately citing the appellate record. *See* Standards for Appellate Conduct, *Lawyers' Duties to the Court* ¶ 3, Texas Rules of Court (State) 324–25 (West 2024), https://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf ("Counsel should not misrepresent, mischaracterize, misquote, or miscite the factual record . . . ."); Tex. Disciplinary Rules Prof'l Conduct R. 3.03, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9).

court acknowledged that the August 2 mediation date would not be used but nevertheless admonished Father's counsel that he needed to contact his client about possibly mediating and indicated that it would sign an order to attempt to secure his presence at a mediation. But that is the last mention in the record about mediation. The record does not indicate whether, after the August 1 hearing, Father wanted to participate in mediation; whether his counsel did or did not contact him about mediation; whether the Department would have been amenable to mediating or making any agreement with Father; or whether coordinating mediation with Father's TDCJ unit was even possible. Thus, although the record shows that Father was not able to attend an August 2 mediation because counsel had not communicated about it with him or the prison, the record is silent as to whether Father was wholly deprived of mediation after August 1.

Counsel extrapolates from the fact that as of the August 1, 2024 pretrial hearing Father's counsel had not yet spoken to Father about whether he wanted to mediate, relinquish his rights, or both to mean that counsel never spoke to Father about whether he wanted to do so. But we cannot infer from a silent record[6] that counsel thereafter failed to contact Father as promised or that Father thereafter

___

[6]This type of silent record—that lacks any evidence showing that the complained-of conduct or omission occurred—is different from a "silent record" that affirmatively shows counsel did or did not engage in complained-of conduct but does not show the reason for the act or omission. *See, e.g.*, *In re L.L.Y.B.*, No. 04-24-00426-CV, 2024 WL 5151156, at *9 (Tex. App.—San Antonio Dec. 18, 2024, no pet. h.) (mem. op.) (evaluating each instance of conduct supported by the record but noting that the record was silent as to the reasons for the complained-of conduct).

desired to mediate but was prevented from doing so solely by his counsel's inaction. *See In re T.N.J.*, No. 13-22-00553-CV, 2023 WL 2182421, at *3 (Tex. App.—Corpus Christi–Edinburg Feb. 23, 2023, no pet.) (mem. op.); *In re R.W.*, No. 02-22-00143-CV, 2022 WL 10509078, at *13 (Tex. App.—Fort Worth Oct. 18, 2022, pets. denied) (mem. op.); *In re A.M.R.*, 652 S.W.3d 117, 129 (Tex. App.—Waco 2022, pet. denied). Nor can we infer that the Department would have agreed to a settlement with Father that would have preserved any contact or relationship with his children. *See, e.g., In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *3 (Tex. App.—San Antonio Aug. 3, 2022, no pet.) (mem. op.) (noting that appellant did not show that a continuance for more time to complete his service plan would have changed trial's outcome in light of proven endangerment grounds); *In re J.P.-L.*, 592 S.W.3d 559, 588–89 (Tex. App.—Fort Worth 2019, pet. denied) (holding that even if trial counsel's failure to seek a guardianship for the mother constituted deficient performance, mother did not show prejudice because it was "unclear at best . . . how a guardian ad litem appointed through a probate court might have changed the outcome other than to increase the amount of time J.P.-L. would spend in foster care"); *In re J.R.W.*, No. 05-15-00493-CV, 2015 WL 5050169, at *4 (Tex. App.—Dallas Aug. 27, 2015, pet. denied) (mem. op.) (holding that prejudice could not be shown, even if alleged failures by counsel did constitute deficient performance, when "Father presented no evidence of what witnesses he would have called, what their testimony would have been, or what exhibits he would have introduced."). Likewise, nothing in the record supports the

affirmative statement in Father's brief that counsel failed "to communicate with . . . Father about . . . the possible consequences of failing to reach an agreement in mediation." *See In re J.B.O.*, No. 11-18-00092-CV, 2018 WL 4496469, at *3 (Tex. App.—Eastland Sept. 20, 2018, no pet.) (mem. op.).

In the absence of any evidence supporting the bare allegations in Father's brief, we cannot hold that counsel was ineffective by failing to secure Father's presence at and participation in pretrial mediation.

## 2. Trial

Father also argues that his trial counsel performed deficiently by failing to secure his presence at the final trial; the Statement of Facts in Father's brief notes, "The record does not indicate that Appellant Father attended the CPS status hearings of record, or the final hearing in this case." But as the Department points out in its brief, the record reflects that counsel applied for and secured a bench warrant for Father's presence at trial and that Father was physically present for trial. The trial court even stated on the record, "And just so the record is clear, I want to make sure that the record reflects that the Respondent Father is present in the courtroom."[7]

---

[7]Despite this statement in the record, Father's brief asserts categorically, "[T]he reporter's record indicates . . . Father was not present." This instance is yet another example of a factual statement in the brief that is not only not supported, but directly contradicted by, the appellate record.

11

Father also argues on appeal that "[t]he trial was short, and [his] counsel made no argument, put on no defense, did not challenge the Department's witnesses, and called no witnesses on [his] behalf."

All the attorneys, including Father's counsel, waived an opening statement. During the State's examination of its first witness, a Department family based safety services (FBSS) worker, Father's counsel did not object to the admission of a certified copy of the trial court's previous temporary orders in the case. But he cross-examined the witness, getting her to admit that the children were removed before Father's paternity was established and that she had merely been told that he had refused to come over to see them at the time of removal; she had no personal knowledge to that effect. Counsel also was able to get an admission from this witness that Father possibly could obtain safe and stable housing after being released from prison.[8]

Father's counsel did not object to the admission of Mother's service plan or affidavit of relinquishment, or to the admission in general of evidence of Father's past convictions. But when the Department offered law-enforcement records related to Father's criminal history, he did object to the admission of "any hearsay from any police officers without . . . the police officer['s] being here [at trial]." The trial court nevertheless admitted the records.

---

[8]The record evidence showing counsel's cross-examination of the Department's witnesses directly contradicts the statement in Father's brief that his trial counsel "did not challenge the Department's witnesses."

12

Father's trial counsel also cross-examined the OCOK[9] permanency specialist; this cross-examination covers ten pages of the forty-seven page reporter's record of the trial. Counsel was able to get the witness to admit that the previous Department caseworker did not, to his knowledge, provide Father with a service plan. The witness further admitted during the cross-examination that he had not talked to Father directly about setting up services; he communicated with Father only through the prison staff. The witness also affirmed that he did not know whether Father got the letters he had sent to the prison.

Father's counsel further elicited testimony from the OCOK specialist that he did not know when Father would be released from prison and that he had not talked to Father before forming his opinion that terminating Father's parent–child relationship with the children was in their best interest. Counsel pointed out, "So there's a lot of collaterals you didn't take into account whenever you took -- when you looked into your -- what you wanted to do in the best interest." And the specialist responded, "That's fair to say, sir." He was also able to get the witness to, effectively, admit that some of the action items in Father's service plan were impossible for him to complete because of his incarceration. On recross, Father's counsel elicited

[9]"OCOK is a private provider of community-based care that contracts with the Department to provide 'foster[-]care case management, kinship, and family reunification services' in parts of the state, including Tarrant County." *M.M.*, 2021 WL 4898665, at *2 n.4.

13

testimony that the trial court had other available options instead of termination of rights: "PMC to the State," for instance.

During the same cross-examination, Father's counsel twice objected to a nonresponsive answer and once to the admission of hearsay; the trial court sustained all three objections.

None of the attorneys gave closing arguments. After the close of evidence, the trial court asked to see all counsel in chambers and went off the record. Nothing in the record indicates what occurred off the record, and no counsel objected to the lack of a record. When the trial reconvened, the trial judge announced her ruling.

We cannot agree with Father that, on this record, counsel's performance was deficient or, even if it was deficient, that the outcome of the proceeding would have been different but for counsel's alleged errors. *See, e.g., J.M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 WL 7163637, at *14 (Tex. App.—Austin Oct. 13, 2022, no pet.) (mem. op.); *A.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00593-CV, 2020 WL 560585, at *7 (Tex. App.—Austin Feb. 5, 2020, pet. denied) (mem. op.); *In re I.B.*, No. 11-18-00273-CV, 2019 WL 1475272, at *2 (Tex. App.—Eastland Apr. 4, 2019, no pet.) (mem. op.); *J.B.O.*, 2018 WL 4496469, at *3.

We overrule Father's first point.

14

## Sufficiency of the Evidence

In his second point, Father challenges the legal and factual sufficiency of the evidence to prove both endangerment grounds[10] found by the trial court as well as the trial court's finding that termination of the parent–child relationship was in the children's best interest.

### A.  Burden of Proof and Standards of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence:  (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest.  Tex. Fam. Code Ann. § 161.001(b)(1), (b)(2); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-rights-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true.  *Z.N.*, 602 S.W.3d at 545.  The factfinder

---

[10]Father also challenged the trial court's finding under Section 161.001(b)(1)(Q), but we need not address this finding in light of our disposition.  *See* Tex. R. App. P. 47.1; *In re W.H.*, No. 02-24-00291-CV, 2024 WL 4705128, at *2 n.4 (Tex. App.—Fort Worth Nov. 7, 2024, pet. denied) (mem. op.).

may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *J.O.A.*, 283 S.W.3d at 346. Moreover, evidence is not legally insufficient merely due to inconsistencies or disputes in the evidence, and "a holistic review of the evidence" should be performed. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *H.R.M.*, 209 S.W.3d at 108. We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that Father's conduct had endangered the children and had created an endangering environment for them and that the termination of the parent–child relationship would be in their best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex.

16

2002).  If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient.  *Id.* at 18–19.

## B.  Endangerment Findings

### 1. Applicable Law

Subsections (D) and (E) both require a finding of endangerment.  "'[E]ndanger' means to expose to loss or injury" or "to jeopardize."  *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see also In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.— Fort Worth July 9, 2015, no pet.) (mem. op.) ("A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards.").  The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from parental misconduct.  *Boyd*, 727 S.W.2d at 533.

Endangerment under Subsection (D) arises from the child's environment, but a parent's conduct can contribute to an endangering environment.  *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  "[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child."  *Id.*; *see J.V.*, 2015 WL 4148500, at *3 ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under

17

[S]ection 161.001(b)(1)(D).") Subsection (D) permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.). It is not necessary to establish that a parent intended to endanger a child to support termination under Subsection (E). *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Nor is it necessary to establish that the parent's conduct caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *In re R.R.A.*, 687 S.W.3d 269, 277–78 (Tex. 2024).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.).

## 2. Analysis

Father's endangerment argument focuses on two primary assertions, in light of his initial lack of certainty that he was the children's biological father: (1) that he was not given sufficient time or opportunity to work any services; and (2) that the evidence fails to show that he had any knowledge about the children's living conditions with Mother. Much of this argument is based on documents in the clerk's record, including the affidavit of removal, that were not entered into evidence at trial. We thus do not consider those items in our sufficiency analysis. *See In re L.E.*, No. 02-24-00036-CV, 2024 WL 2347643, at *2 n.4 (Tex. App.—Fort Worth May 23, 2024, no pet.) (mem. op.) (noting that although trial court may take judicial notice of documents in its file, it cannot take judicial notice that allegations in those documents, including a family service plan or removal affidavit, are true).

The evidence showed that Father had a history of criminal convictions and behavior beginning with a 2013 conviction for burglary of a habitation.[11] After that, he was convicted of possession of methamphetamine and, during multiple arrests, was

---

[11]Although the trial court in that case initially placed Father on deferred adjudication, it later adjudicated him guilty and sentenced him to three years' confinement, based on allegations to which Father had pleaded true. These allegations included evading arrest, testing positive for marijuana and opiates, and failing to participate in substance-abuse counseling.

found to be in possession of methamphetamine and possibly heroin.[12] He had also been charged with misdemeanor driving while intoxicated.

On September 24, 2022, Father was arrested for assaulting Mother by impeding her breath. Mother told the responding officer that Father had put her in a headlock and struck her forehead; he "then forced [her] out of the house after taking her phone" and refused "to allow her to have" A.A., who was one year old at the time. Mother told the officer that when Father had her in the headlock, she thought she was going to die. The officer noticed "a fresh scratch on her back and fresh bruising on her left forearm." A magistrate issued a sixty-one-day emergency protective order applicable to Mother and both children.

In January 2023—while released on bond for the assault offense—Father was arrested for continuous family violence, criminal trespass, and possession of a controlled substance after again assaulting Mother. Mother had reported that Father had "kicked the door in of [her] apartment and was refusing to leave." Father admitted to the responding officer that he had forced the door open and "punched a candle that was inside the apartment." Mother also told the officer that Father had punched her earlier in the day; "her face appeared to be red with raised skin." Mother had called the police at the time of this earlier assault as well, but when they arrived

_____

[12]In Father's brief on appeal, counsel asserts that other than the evidence of Father's incarceration at the time of removal and trial, "[n]o other evidence of any other criminal history of Appellant Father is contained within the record." This is incorrect.

20

the first time that day, she had "denied any assault." A magistrate issued another sixty-one-day emergency protective order, applicable to Mother and both children. Father again bonded out and remained released until June 2023, when he was re-arrested for the September 2022 assault.

The FBSS worker testified that her first contact with the children was when she visited their maternal grandmother's home where Mother was living with the children. The Department knew that Mother had a history of drug use, and it suspected that she had "some mental health problems"; also, the children "had gotten out of the house several times." The FBSS worker "had a lot of concerns once [she] was in the house and saw the environment." According to the FBSS worker, the children were not at home at the time because they were in daycare, but "there were two unknown people in a bedroom," and "they refused to come out." Additionally, "there was a lot of paraphernalia in the home that was accessible for the children."[13] The OCOK specialist understood that at the time of removal Mother, the children, their maternal grandmother, and one of Mother's college friends were living in the home; Father "was in and out of the residence."

The FBSS worker made the decision to remove the children at that time. She was not able to talk to Father until after the removal. But he was not an option for

---

[13]In context of her immediately preceding testimony, the worker appeared to be referring to drug paraphernalia.

the children's placement because of his criminal history and incarceration.[14] In addition, the OCOK specialist had concerns about Father's "allowing [Mother] to continue to care for [the] children, given her history."

Father did not attend the first temporary orders hearing; the FBSS worker had been told he had refused to come out of his cell. At that time, he had not yet undergone paternity testing, but he told the FBSS worker that "it was his understanding he was the father to both of the children." Father's services were delayed while waiting on the results of the paternity testing, but the OCOK specialist testified that Father could have worked some services before the test results were confirmed—parenting classes, counseling, "the drug and alcohol assessment," and the psychosocial examination. The OCOK specialist had been told by someone at the prison where Father was incarcerated that it provided "some services to parents, but [that] the parent would have to take initiative to complete those services." Father had not completed any classes or assessments by the time of trial. He had not communicated where he expected to live upon his release from incarceration, nor had he communicated any plans for employment or placement of the children.

Father argues that the evidence is insufficient to support the endangerment findings because there is no evidence that he "was ever aware of any potential danger

_____

[14]The Department never presented evidence of the judgment of conviction upon which Father's incarceration at the time of trial was based. The OCOK specialist testified that Father was incarcerated at the time of removal because he had committed a crime.

22

to the children in their environment with Mother and that [he] disregarded that risk, or that he was aware that Mother would leave the children with others who endangered their physical or emotional well-being." In fact, Father notes that "the record does not even indicate whether [he] was aware that he was the biological father of the children at issue at any point prior to the DNA testing in this case."

Leaving aside the fact that some evidence in the record does support a conclusion that Father knew at least that he might have been the children's father, "[s]everal courts of appeals, including this one, have held that in evaluating endangerment, a factfinder may consider evidence of a father's behavior that occurred before his paternity was confirmed." *In re M.R.*, No. 02-22-00118-CV, 2022 WL 4545534, at *6 (Tex. App.—Fort Worth Sept. 29, 2022, no pet.) (mem. op.). And Father's criminal history leading to incarceration, including his assaults of Mother in the home—one of which occurred with at least one child present—was endangering conduct sufficient to support the trial court's endangerment findings under (D) and (E) grounds. *See, e.g., In re K.O.*, No. 07-23-00440-CV, 2024 WL 3219837, at *7–8 (Tex. App.—Amarillo June 26, 2024, no pet.) (mem. op.); *In re E.T.*, No. 02-22-00299-CV, 2022 WL 17172492, at *4 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.); *In re G.W.*, No. 02-22-00181-CV, 2022 WL 4545568, at *3 (Tex. App.—Fort Worth Sept. 29, 2022, pet. denied) (mem. op.); *In re A.B.*, No. 13-13-00468-CV, 2014 WL 346033, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 30,

23

2014, no pet.) (mem. op.); *In re J.A.W.*, No. 2-08-215-CV, 2009 WL 579287, at \*5 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (per curiam) (mem. op.).

## C. Best-Interest Finding

### 1. The Law on Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A) the child's desires;
>
> (B) the child's present and future emotional and physical needs;
>
> (C) the present and future emotional and physical danger to the child;
>
> (D) "the parental abilities of the individuals seeking custody";
>
> (E) "the programs available to assist these individuals to promote the [child's] best interest";
>
> (F) "the plans for the child by these individuals or by the agency seeking custody";

24

(G) "the stability of the home or proposed placement";

(H) the parent's acts or omissions that indicate "the existing parent–child relationship is not a proper one"; and

(I) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 2. Analysis

Without identifying any particular factor or evidence, Father contends that there is "scant" evidence on some of the *Holley* factors and that evidence pertinent to others is "wholly absent." But Father's argument overstates the case.

25

### a. The Children's Desires, Present and Future Emotional and Physical Needs, Parenting Abilities of Maternal Grandmother, Plans for the Children, and Stability of Placement with Maternal Grandmother

It is true that there is no direct evidence of the children's desires; they were five and three years old at the time of trial. In addition, there was no evidence about any programs available to those seeking custody.

But the trial court heard evidence that the children had been living with their maternal grandmother for the previous nine months. They were "doing great" with her and "thriving." All of their needs were being met, they were loved, they were current with their medical and dental appointments, and they had no behavior concerns.[15] They were "communicating very well also." The Department's long-term plan for the children was for them to be adopted by their maternal grandmother; the children were excited by the prospect. The OCOK specialist testified that it was his personal belief that allowing the maternal grandmother to adopt the children would be in their best interest because it would provide them with the long-term stability and consistency that they needed. He also testified, "It was my understanding that both parents agreed that [the maternal grandmother] was . . . [the] best fit for the children long-term."

---

[15]The CASA (court-appointed special advocate) confirmed this testimony. *In re A.M.*, No. 02-24-00199-CV, 2024 WL 4157766, at *1 n.4 (Tex. App.—Fort Worth Sept. 12, 2024, pet. denied) (mem. op.).

At the time of trial, the children were very bonded with each other. The CASA believed that the maternal grandmother was a wonderful caregiver, who treated the children with love, compassion, and appropriate discipline. Her home was "a very safe and loving environment." The CASA had no concerns with the maternal grandmother's care.

Although the OCOK specialist acknowledged that the trial judge had the option to consider naming the Department as the children's permanent managing conservator, he did not believe that doing so would be in the children's best interest in light of their maternal grandmother's appropriateness and availability.

### b. Present and Future Emotional and Physical Danger to the Children, Father's Lack of Stability, and Any Excuses for Father's Acts or Omissions

Father has a prior history of criminal activity that includes evidence of drug possession and use and a charge for driving while intoxicated with alcohol. Twice before the children were removed from Mother's care, Father assaulted Mother; at least one of the children was present during the first assault, and Father admitted having used heroin before he committed the second assault.

The Department was concerned about Father's protective capacity regarding Mother; it was not as concerned about the maternal grandmother's. For example—according to the OCOK specialist's "interpretation" of the investigation report when the children were removed from Mother's care—their maternal grandmother had not left them unattended with the drug paraphernalia in the house; she had been taking a

27

shower and had locked the children in her bedroom with her.[16]   Additionally, the maternal grandmother "ultimately made the decision to have [Mother] removed from the residence."  She understood the Department's expectations and requirements and had done everything the Department had asked her to do.

Father never reached out to the OCOK specialist while the case was pending, nor did he provide the Department with any information regarding where he planned to live or work upon his release from prison.  When asked if it would "make any difference when [Father] was released at this point," the OCOK specialist said, "No."[17]

Father never let the Department know of any other person who he thought would be an appropriate placement for the children.  And although Father has a daughter who is a few years older than the children, the OCOK specialist understood from others that Father had had "very little contact" with her.

### 3. Analysis

Even considering that the evidence is lacking here as to two of the *Holley* factors, *C.H.*, 89 S.W.3d at 27, we nevertheless conclude that the evidence is legally

---

[16]Although this testimony contradicts the FBSS worker's testimony, the trial court as the factfinder was empowered to resolve this conflict in favor of its best-interest finding.  *See Z.N.*, 602 S.W.3d at 545.  For example, the trial court could have determined that the children's maternal grandmother had not left them alone with accessible drug paraphernalia either because they were at daycare or because she ensured they stayed close to her while in the home.

[17]The Department did not offer evidence of Father's expected release date.

and factually sufficient to support the trial court's best-interest finding. When considered in light of Father's acts and omissions, including his criminal history and lack of a concrete plan to provide a safe and stable environment for the future, the children's circumstances at the time of trial—and likely stability of their future circumstances in maternal grandmother's care in the future—weighed heavily in favor of the trial court's finding that terminating Father's parent–child relationship with the children was in their best interest. *See, e.g.*, *In re T.E.*, No. 02-24-00271-CV, 2024 WL 4631296, at *6 (Tex. App.—Fort Worth Oct. 31, 2024, no pet.) (mem. op.); *G.W.*, 2022 WL 4545568, at *4.

Having determined that the evidence is legally and factually sufficient to support the trial court's endangerment and best-interest findings, we overrule Father's second point.

## Conclusion

After overruling both of Father's points, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  February 13, 2025

29